SO ORDERED.

Dated: May 8, 2020

Daniel P. Collins, Bankruptcy Judge
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 7 Proceedings |
| DAVID M. RAIFFE, | Case No.: 2:18-bk-15086-DPC |
| Debtor. | Adversary No.: 2:19-ap-00098-DPC |
| UNITED MIDWEST SAVINGS BANK, dba MIDWEST BUSINESS CAPITAL, | UNDER ADVISEMENT ORDER |
| | [NOT FOR PUBLICATION] |
| Plaintiff, | |
| v. | |
| DAVID M. RAIFFE, | |
| Defendant. | |

This adversary proceeding ("Adversary Proceeding") involves a loan for $400,000 ("Loan") from Plaintiff, Midwest Savings Bank ("Plaintiff") to Defendant, David M. Raiffe ("Defendant" or "Debtor") for him to acquire a dental practice in Hamilton, Ohio. Plaintiff claims the Loan is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B)[1] because Defendant submitted a false personal financial statement (the "PFS") as part of his Loan application. After considering the testimony and exhibits introduced at trial as well as the oral arguments and post-trial briefs of counsel, this Court finds that the Loan is a non-dischargeable debt under § 523(a)(2)(B).[2]

---

[1] Unless indicated otherwise, statutory citations refer to the U.S. Bankruptcy Code, 11 U.S.C. §§ 101 – 1532.
[2] This Order constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

1

## I. BACKGROUND

On March 15, 2019, Plaintiff commenced this Adversary Proceeding by filing a three-count complaint[3] against Defendant. On April 22, 2019, Defendant filed his answer.[4]

On December 18, 2019, Defendant filed a motion in limine ("Motion in Limine")[5] requesting that the Court bar any introduction of evidence regarding Defendant's income to debt ratio and use of such ratios by Plaintiff in the Loan application process. Plaintiff filed its response,[6] Defendant filed his reply.[7] After a hearing on Defendant's Motion in Limine the Court ruled that no evidence was to be presented at trial concerning ratios, formulas, debt service coverage or debt to income ratios considered by Plaintiff in approving the Loan but that evidence of cash flows considered by Plaintiff would be admissible.[8]

On January 17, 2020, the parties filed their joint pre-trial statement.[9] Trial was held on January 27, 2020 and January 28, 2020. Plaintiff submitted its Post-Trial Brief,[10] Defendant submitted his Response to Plaintiff's Post-Trial Brief,[11] and Plaintiff submitted its Reply.[12]

## II. JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 157(b)(2)(I). The parties have consented to this Court's jurisdiction to enter final orders.[13]

---

[3] DE 1. "DE" references a docket entry in this Adversary Proceeding 2:19-ap-00098-DPC. Prior to the start of trial, Plaintiff orally moved to dismiss Count I (§ 523(a)(4)) and Count II (§ 523(a)(6)).
[4] DE 7.
[5] DE 16.
[6] DE 17.
[7] DE 19.
[8] DE 25.
[9] DE 23.
[10] DE 30.
[11] DE 31.
[12] DE 32.
[13] *Id.* at page 2, lines 1 – 2 and lines 8 – 9.

2

**III. LEGAL ANAYLSIS**

    A. § 523(a)(2)(B)

The Bankruptcy Code provides for a chapter 7 discharge of an individual debtor's debts[14] but "limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor."[15] Section 523 enumerates nineteen exceptions to discharge. Section 523(a)(2)(B) is the only discharge exception at issue in this case. That section states:

> (a) A discharge under section 727, 1141, 1228(b), or 1328(b) of this title does not discharge an individual debtor for any debt –
> …
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> …
> (B) use of a statement in writing –
>     (i) that is materially false;
>     (ii) respecting the debtor's or an insider's financial condition;
>     (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>     (iv) that the debtor caused to be made or published with intent to deceive…

The party claiming non-dischargeability has the burden of proving each of these elements by a preponderance of the evidence.[16] The Ninth Circuit has articulated a § 523(A)(2)(B) claim as consisting of the following seven elements:

> (1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, and (7) that damage proximately resulted from the representation.[17]

---

[14] 11 U.S.C. § 727.
[15] *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).
[16] *Id.* at 291.
[17] *In re Candland*, 90 F.3d 1466, 1469 (9th Cir. 1996)(citing *In re Siriani*, 967 F.2d 302, 304 (9th Cir. 1992)).

3

"Material misrepresentations for [§ 523(a)(2)(B) purposes] are substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision."[18] A material misrepresentation alone is not enough to deny discharge. The debtor also must have known the misrepresentation to be false, the creditor must have reasonably relied on the misrepresentation and the misrepresentation must have proximately caused the damages suffered.[19]

The Ninth Circuit does not impose a duty on creditors to engage in extensive investigations concerning a borrower's written financial statements but, rather, has found that creditors are entitled to reasonably rely on false financial statements where minimal investigation has occurred.[20] "Lenders do not have to hire detectives before relying on borrowers' financial statements…[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification."[21] When there is evidence of materially fraudulent statements, little investigation is required for a creditor to have reasonably relied on the representations.[22] Once a court determines that a debtor submitted a materially false financial statement to lender, the reasonableness requirement under § 523(a)(2)(B) is a low standard for the creditor to meet and only intended as an obstacle for creditors acting in bad faith.[23]

### B. Application of Agency Law

The Defendant claims his PFS[24] submitted to Plaintiff was prepared not by him, but, rather, by his employee Opal Anderson ("Anderson"). Plaintiff contends Anderson was Defendant's agent and that Defendant is bound by her actions taken on his behalf.

---

[18] *Id.* at 1470.
[19] *Id.*
[20] *Id.* at 1471 (finding that creditor who compared address and social security number on a financial statement with a credit report and checked the credit report for outstanding judgments reasonably relied on a debtor's false financial statement).
[21] *In re Figge*, 94 B.R. 654, 665 (Bankr. S.D. Cal. 1988), *aff'd* 928 F.2d 1136 (9th Cir. 1991)(table).
[22] *In re Gertsch*, 237 B.R. 160, 170 (9th Cir. BAP 1999).
[23] *Id.* (citing *In re Bonnanzio*, 91 F.3d 296, 301 (2d. Cir. 1996)).
[24] Trial Exhibit ("Ex.") 1.

The law of agency is a matter of state law. The alleged acts of agency in this case occurred in Ohio.

Ohio courts define agency as "the relationship that results when one party agrees to another person or entity's acting on its behalf."[25] "The former becomes the 'principal,' and the latter is the 'agent.'"[26] A principal is bound by the terms of a contract that an agent entered into on the principal's behalf.[27] Bankruptcy courts have similarly found that agency principles apply in the context of § 523 and have not permitted defendant debtors to escape responsibility by shifting blame to agents for supplying the misrepresentations to creditors.[28]

## IV. TRIAL

The Court heard testimony from three witnesses. Their testimony is summarized as follows.

### A. Spencer Twyford

Spencer Twyford ("Twyford") is a business development officer for Plaintiff. He has held that position since January 2016. Twyford has approximately 22 years of experience as a business development officer and works primarily on Small Business Association ("SBA") loans.

Twyford first met Defendant about 15 years ago and has since worked with Defendant on seven loans to enable Defendant to purchase various dental practices. Twyford came to understand that Defendant's business model was to purchase underperforming dental practices, work at the purchased practice during the transition period in an effort to get the practice moving in the right direction, retain patients, integrate associate dentists, and then stepping back from the day to day business of the newly acquired practice.

---

[25] *Mtge. Network, Inc. v. Ameribanc Mtge. Lending, L.L.C.*, 177 Ohio App.3d 733, 738 (Ohio App. 10th Dist. 2008).
[26] *Id.*
[27] *Id.*
[28] See *In re Reisman*, 149 B.R. 31 (Bankr. S.D.N.Y. 1993) and *In re Matkins*, 605 B.R. 62 (Bankr. E.D. Va. 2019).

Twyford testified about the SBA loan process and discussed in detail the forms that are a part of an SBA loan package. Twyford testified that he frequently receives questions from borrowers about the form financial statement but that Defendant never asked any questions about his PFS. After receiving Defendant's PFS[29], Twyford ran a credit report on Defendant and ultimately recommended that the Loan be approved.

Twyford testified that Defendant never informed him that Defendant might move to Arizona. Twyford also indicated that such a move would be a substantial deviation from Defendant's business model. If Defendant had indicated that he intended to move from Ohio, Plaintiff would have addressed this matter before the Loan would have been approved. Twyford also testified that Defendant never disclosed to him that he had purchased a home in Arizona (the "Cave Creek Home") nor did he disclose to Plaintiff the $1.5 million of new debt he incurred in purchasing the Cave Creek Home.

On redirect, Twyford acknowledged that the Loan was not conditioned on Defendant living in Ohio. Twyford further clarified, that if a borrower's financial statement was known to contain inaccurate statements, he would only require an amended financial statement if such inaccuracies were not addressed in other loan documents.

B. Craig Street

Craig Street ("Street") has been an executive vice president and chief lending officer for Plaintiff since January 2016. Street has extensive experience with SBA lending. He testified as to unique aspects of SBA loans. Street discussed in detail the SBA loan approval process, focusing on the importance of a potential borrower's financial statement. Street referred to a borrower's financial statement as a "foundational document."

Street testified that a financial statement is used to determine the global cash flow and personal debt structure of a loan applicant. Street discussed how the information in a

---

[29] Again, Ex. 1.

financial statement is often cross checked with an applicant's credit report and that it is "vital" that the information in financial statement be accurate.

Street discussed the specific Loan which Plaintiff made to Defendant. Street understood the Loan to be made for the purpose of Defendant purchasing a dental practice in Hamilton, Ohio. Street testified that he understood the Defendant's PFS was completed, signed and submitted by Defendant.

Street testified that at the time of Defendant's Loan application, he was not aware that Defendant had purchased the Cave Creek Home or that Defendant borrowed $1.5 million to facilitate the purchase of the Cave Creek Home or that Defendant intended to move to Arizona. Street understood that Defendant lived in Solon, Ohio at the address provided in Defendant's PFS.

Street testified that if he had known of Defendant's intent to move to Arizona, he would have seen this as a significant departure from Defendant's business model. Street further testified that had he learned of either Defendant's purchase of the Cave Creek Home, the accompanying $1.5 million in new debt or Defendant's intent to move to Arizona, he would have immediately halted the Loan application process.

On cross examination, Street discussed Plaintiff's underwriting process in general and which specific documents were considered as part of the approval process for Plaintiff's Loan to Defendant. Street testified that the Loan "was a fairly small loan" with "fairly small exposure." Street recognized that a more thorough analysis of the Loan documents and underwriting process for this Loan would have been desirable. In Street's own words, "[t]his credit memo is not going to win any – you know, we're not submitting it to RMA."[30]

---

[30] January 28, 2020 Trial Transcript at DE 34, page 36, lines 8 – 10. "RMA" is believed to refer to Risk Management Association, formerly known as Robert Morris Associates. On "July 11, 2000, the name of the Association changed to more accurately reflect RMA's expanding commitment to risk management best practices." According to RMA's website: "RMA was founded in 1914 to help commercial bankers make better lending decisions through the exchange of credit information. Today, RMA is the only association that specializes in promoting effective and prudent risk management practices for institutions of all sizes, across the entire financial services industry. Headquartered in Philadelphia, Pennsylvania, RMA has approximately 1,900 institutional members that include banks of all sizes as well as nonbank financial institutions. They are represented in the Association by 18,500 risk management professionals who are chapter members in financial centers throughout North America, Europe and Asia/Pacific."

C. David Raiffe

Defendant is a Doctor of Dental Surgery ("DDS") and holds a Master's degree in Business Administration ("MBA"). He signs his name "David M. Raiffe, DDS, MBA."[31] Over the years, Defendant owned at least eight dental practices in Ohio. He purchased all but one of these practices using an SBA loan. Defendant testified that although he obtained several SBA loans over the years, he never personally filled out a loan application. It was Defendant's practice to have Anderson, his regional manager, complete his loan application documents. Anderson did so with Defendant's permission and knowledge. Despite not completing the loan documents himself, Defendant understood that the loan application process involved disclosing his assets, liabilities, income and expenses and that a bank lender would rely on the information provided in his applications.

Defendant testified that he first started contemplating a move to Arizona around 2013 or 2014. Defendant purchased the Cave Creek Home on April 27, 2016 for the price of $1.5 million. To close the purchase Defendant obtained a loan for $1.2 million from Everbank, FSA[32] plus a $300,000 loan from his father. Defendant understood that he would be paying $3,000 per month to his father and another $5,500 per month to his mortgage company.[33]

Defendant testified that, although his PFS did not disclose his Cave Creek Home or corresponding liabilities, he had told Twyford "lots of times about moving to Arizona." Defendant specifically recounted a conversation he had with Twyford in June 2016 in which Defendant was inquiring about the possibility of refinancing previous loans and how Defendant told Twyford about living in Arizona. Defendant also testified that he had conversations in 2015 with Twyford about a possible purchase of an Arizona dental practice and Defendant's desire to move to Arizona. Defendant considered Twyford to be his personal banker but did not consider Twyford to be one and the same as Plaintiff.

---

[31] For example, see Exs. 1, 3 and 5.
[32] Exs. 3 and 5.
[33] Ex. 3 indicates Defendant's first payment was due to Everbank on June 1, 2016 in the amount of $5,519.71

8

Defendant described his business model as finding a dental practice to purchase, then staffing the new practice with one or more dentists, a practice manager, dental assistants and dental hygienists. Defendant testified that he never worked at the dental practice, except for the rare occasion in which he would help train associate dentists with difficult procedures.

A substantial part of Defendant's testimony concerned whether he signed particular documents in connection with the Loan or whether Anderson used his signature stamp. Defendant testified that Anderson purchased at least two signature stamps which she periodically used to fill out documents related to financing or operating of Defendant's dental practices. Defendant confirmed that he did not remember signing the PFS and therefore the signature on the PFS must have been from Defendant's signature stamp.

### V. **Findings of Fact**

#### A. Representations by Debtor

Defendant claims he did not sign the PFS but assumes his signature was applied to the PFS by Anderson using Defendant's signature stamp. This Court finds Defendant's testimony lacking credibility and finds that Defendant <u>did</u> sign the PFS. Moreover, even if Defendant's financial information was placed in the PFS by Anderson and his signature was applied to the PFS by Anderson via Defendant's signature stamp, this Court finds Defendant directed her to do so. Under Ohio agency law, since Anderson's actions were directed by Defendant, he is bound by the representations and signature made on his behalf in the PFS. This Court also finds Defendant directed Anderson or others working for him to fax the PFS to Plaintiff from his Warren Dental Practice on May 17, 2016. The PFS was dated as of May 29, 2016.[34]

---

[34] The PFS form indicates on the top right corner of page 1 that the expiration date for that form statement is "8/31/2011." The Court finds this to be of no consequence. Using an outdated financial statement form does not invalidate the representations made in that statement or the reliance a lender is entitled to make upon those representations.

9

In the PFS, Defendant represented to Plaintiff that his then current residential address was 7601 Royal Portrush Dr., Solon, Ohio 44139 (the "Solon Home").[35] Defendant testified that he moved to Arizona in May 2016. His PFS dated as of May 29, 2016, therefore, misrepresented that he resided in the Solon Home. This misrepresentation was further compounded when Defendant signed his July 20, 2016 Affidavit of No Adverse Change and Agreement to Correct Errors and Omissions[36] where he acknowledged his commitment to "promptly correct any defect, error or omission" in any of the Loan documentation. The issue of Defendant's residency continued to be obfuscated when he signed the July 20, 2016 Unconditional Guarantee[37] of this Loan. That document indicates it was signed by Defendant in Columbus, Ohio and notarized in New Albany, Ohio.[38]

Defendant further represented that he had "$_____" in total assets, $5,311,489 in total liabilities and a net worth of $221,000.[39] Defendant also represented that he owed three parcels of real estate: (1) The Solon Home, (2) Defendant's commercial property in Akron, Ohio, and (3) Defendant's commercial property in Bucyrus, Ohio. Defendant further represented that his mortgage payments for the disclosed real properties were current and as follows: (1) $1,988 per month for the Solon Home,[40] (2) $168,276 per year for the Akron property, and (3) $168,276 per year for the Bucyrus property.

---

[35] The Solon Home is located about 20 miles from Cleveland, Ohio. Most of Defendant's dental practices were relatively near the Cleveland area.
[36] Ex. 16.
[37] Ex. 15.
[38] New Albany is a suburb of Columbus. Both places are approximately equidistant between Cleveland and Hamilton, which is to say they are not nearby.
[39] The Court acknowledges that the presentation of information and the math on Defendant's PFS is abysmal. This issue will be addressed in more detail below in Section V(F).
[40] This referred to only the first mortgage of $384,317 on the Solon Home but omits the 2nd mortgage ($97,574) and the 3rd mortgage ($789,909) referenced in §7 of the PFS. Defendant also misrepresented ownership of the Solon Home as well as his liability on the Solon Home mortgage. This fact is ignored by the Court because Plaintiff knew the Solon Home was owned by Defendant's wife and also chose to ignore this fact. See Plaintiff's Credit Analysis (Ex. 47, page 14) where Plaintiff's internal records noted Plaintiff checked the Cuyahoga County auditor's website which reflected that the Solon Home "appears to be owned by Dr. Raiffe's spouse…" At page 24 of this Credit Analysis, Plaintiff's records state: "The submitted PFS notes a mortgage on the Dr.'s residence; this is not reflected on Dr. Raiffe's personal credit bureau. A search of the Cuyahoga county auditor's website reports the owner as Marybeth Puckace. the Dr.'s spouse's name is Marybeth."

Defendant misrepresented the Solon Home as his place of residency, omitted his new $1.2 million mortgage and the accompanying $5,500 per month mortgage payment, and omitted the $300,000 loan from his father which was to be paid at the rate of $3,000/month.

Exhibit 3, the First Payment Notification from Everbank, identifies Defendant as the sole borrower for the Cave Creek Home mortgage.[41] It further notifies Defendant that his first payment in the amount of $5,519 is due on June 1, 2016.[42] Exhibit 4, the Warranty Deed for the Cave Creek Home, conveys the Cave Creek Home to Defendant "as his sole and separate property."[43] Again, he is the only individual identified in Exhibit 4.[44] Finally, Exhibit 5, the Everbank Deed of Trust on the Cave Creek Home, identifies only Defendant as the "Borrower."[45] All of these documents contradict Defendant's testimony that he and his wife are equally responsible for the mortgage payments on the Cave Creek Home. This Court finds that Defendant's PFS omitted the entirety of his $5,500 monthly obligation to Everbank on the Cave Creek Home. The Court also finds Defendant's testimony regarding his wife's obligation to pay half of the Everbank mortgage lacking credibility.

Defendant's false representations were not limited to his PFS. This Court finds that Defendant's testimony, to the effect that he disclosed to Twyford and Street his intent to move to Arizona, was not credible. Twyford testified that he did not know of Defendant's intent to move to Arizona. Defendant's testimony to the contrary is unconvincing. This Court recognizes that although in the past Defendant discussed with Twyford a possible purchase of an Arizona dental practice, this fact does not suggest that Twyford was informed of Defendant's intent to move to Arizona.

### B. Defendant's Misrepresentations and Omissions were Material

The misrepresentations and omissions in Defendant's PFS were material. This

---

[41] Ex. 3.
[42] *Id.*
[43] Ex. 4.
[44] *Id.*
[45] Ex. 5.

Court finds credible Street's and Twyford's testimony regarding how Defendant's Loan application process would have gone quite differently had Defendant disclosed either his intent to move to Arizona, the purchase of the Cave Creek Home or the financing required to facilitate the purchase of the Cave Creek Home. This Court finds that, had Defendant properly disclosed either his intent to move to Arizona or the resulting liabilities he incurred to purchase the Cave Creek Home, Plaintiff would have halted the Loan application process.

Defendant's failure to state in his PFS his correct residence or his intent to move to Arizona was material. This Court finds Plaintiff understood that Defendant's business model was to purchase a dental practice, staff the practice with dentists, assistants, hygienists and an office manager, work the practice during a transitional period while residing at the Solon Home, seek to retain patients of the newly acquired practice and then step away from the day to day business of the practice once it was successfully transitioned. Defendant's purchase of the Cave Creek Home together with his intent to move to Arizona were substantial deviations from Defendant's business model. Street and Twyford were credible when they testified about how such a departure from Defendant's known business model would have triggered increased scrutiny of the Loan application.

To be clear, the Court is not finding that, had Plaintiff discovered prior to making the Loan that Defendant was hiding the truth of his residency, Plaintiff would have declined the Loan. This Loan was not conditioned on Defendant living in the Solon Home or anywhere else. Defendant wished to purchase a dental practice in Hamilton, Ohio. Hamilton is about 250 miles from Solon. Plaintiff knew this and could not reasonably expect Defendant to commute from Solon to Hamilton or to even spend substantial amounts of time in Hamilton with that dental practice. Plaintiff knew or should have known Defendant would, at most, help transition the Hamilton practice into his group of dental practices and then manage Hamilton from afar. "Afar" could well have been Cave Creek, Az. Stated differently, Defendant misrepresenting his residency was itself a material falsehood but not the determinative factor in Plaintiff granting the Loan.

Moreover, Defendant's false written statement concerning his place of residence is not a statement "respecting the debtor's…financial condition," as required by §523(a)(2)(B)(ii). However, combined with Defendant's other misrepresentations and omissions which <u>were</u> "respecting debtor's… financial condition," Plaintiff satisfied its burden of proof on this §523(a)(2)(B)(ii) element.

### C. <u>Defendant Knew His Representations Were False</u>

This Court finds that Defendant's testimony as to his knowledge of the contents of the PFS to be lacking credibility. Defendant purchased the Cave Creek Home on April 27, 2016. He submitted his PFS to Plaintiff on May 17, 2016. Defendant knew as of April 27, 2016 that he intended to move to Arizona, that the purchase of the Cave Creek Home had been facilitated by borrowing a total of $1.5 million and that none of this information was disclosed in Defendant's PFS subsequently submitted to Plaintiff.

### D. <u>Defendant's Misrepresentations and Omissions were Made with Intent to Deceive Plaintiff</u>

Defendant is a DDS and has an MBA. Defendant is a sophisticated and experienced businessman who had previously obtained at least seven SBA loans. Defendant testified that he understood the importance of a PFS and how a potential lender would rely on the information provided in his loan applications. Defendant further understood that Plaintiff was familiar with his business model. This Court finds that Defendant's failure to disclose his move to Arizona or the obligations incurred to acquire the Cave Creek Home were intentional omissions made by Defendant to deceive Plaintiff. Defendant knew or should have known Plaintiff would be alarmed if it knew Defendant had moved to Arizona. Defendant intended to conceal this move from Plaintiff and, therefore, omitted from his PFS any reference to his new residency or the ownership of the Cave Creek Home or the significant debts and monthly debt service burdens he incurred to acquire that home

13

### E. Plaintiff Relied on Defendant's Representations

This Court finds that Street's testimony regarding the importance of the PFS is credible. Street testified that the PFS is a "foundational document" that Plaintiff used to determine the global cash flow and personal debt structure of Defendant. This Court finds that Plaintiff relied on the information contained in Defendant's PFS. Street and Twyford so stated in their testimony. This testimony was also credible. Defendant acknowledged that he expected Plaintiff to rely on his PFS.

### F. Plaintiff's Reliance was Reasonable

This Court finds Plaintiff's reliance on the PFS, and information contained therein concerning Defendant's financial condition, was reasonable. Lenders are entitled to reasonably rely on information contained in financial statements submitted by potential borrowers.

Defendant points out, and this Court acknowledges, that there are numerous glaring mistakes in Defendant's PFS. For example, this is what Defendant's balance sheet reflects:

"Cash on hand and in Banks: $193,000     Notes Payable to Banks and Others: $1,662,000
IRA or other Retirement Account: $100,000     Installment Account (Auto): $150,000
Real Estate:                              $700,000      Installment Accounts (Other): $60,000
Automobile-Present Value:      $15,000      Mortgages on Real Estate: $482,000
Other Assets:                           $5,311,489     Total Liabilities: $5,311,489
Total:                                       $_____     Net Worth: $221,000."

If the Defendant's balance sheet was simply mathematically accurate, it should read:
Cash on hand and in Banks: $193,000     Notes Payable to Banks and Others: $1,662,000
IRA or other Retirement Account: $100,000     Installment Account (Auto): $150,000
Real Estate:                              $700,000     Installment Account (Other): $60,000
Automobile-Present Value:     $15,000      Mortgages on Real Estate: $482,000

14

| | | | |
|---|---|---|---|
| Other Assets: | $5,311,489 | Total Liabilities: | $2,354,000 |
| Total: | $6,319,489 | Net Worth: | $3,362,000. |

The Defendant's net worth number is dramatically larger if the math is done correctly. Plaintiff, however, compared Defendant's PFS with the credit report it obtained and determined in its Credit Analysis[46] that Defendant's balance sheet should read as follows:

| | | | |
|---|---|---|---|
| Cash on hand and in Banks: | $193,000 | Revolving Debt: | $12,954 |
| IRA or other Retirement Account: | $100,000 | Installment Debt: | $261,605 |
| Real Estate: | $700,000[47] | Installment Account (Other): | $60,000 |
| Automobile-Present Value: | N/A | Residential Mortgage: | $384,317 |
| Business Interests(net worth only) | $5,311,489 | Total Liabilities: | $658,876 |
| Total: | $6,319,489 | Tangible Net Worth: | $349,124. |

Plaintiff's focus was, therefore, on Defendant's <u>tangible</u> net worth. His dental practices were not considered by Plaintiff to be a part of that calculation, presumably because it would have been quite difficult to collect the Loan from those illiquid assets. This analysis reveals that Plaintiff was not thrown off by the math errors in Defendant's PFS. Plaintiff did an independent analysis of Defendant's credit worthiness to confirm the accuracy of the assets and liabilities identified int the PFS.

    In Plaintiff's Credit Analysis it focused even more heavily on defendant's ability to service the Loan. The credit report reflected Revolving Debt service needs of $312/month and Installment Debt monthly service needs of $8,010. The Credit Analysis acknowledged Defendant had limited liquidity and that the available collateral would be insufficient to bail the Plaintiff out of a default on the Loan. It was Defendant's anticipated cash flows from the Hamilton practice and from Defendant personally which were crucial

---

[46] Ex. 47.
[47] The Solon Home and mortgage debt were inexplicably included on this balance sheet even though Plaintiff quite clearly understood it was not his home or his debt. See Footnote 39 above.

15

to the success of this Loan[48] Of course, Plaintiff could not have known that Defendant was also facing monthly debt service obligations in the amount of $8,500 on the Cave Creek Home. This omission was ultimately fatal to Plaintiff when the Hamilton practice apparently could not support repayment of the Loan. At bottom, it was not the math errors in Defendant's PFS which should have cautioned Plaintiff against making this loan, it was significant undisclosed debt and debt service which harmed Plaintiff.

This Court finds that Plaintiff obtained a credit report on Defendant in an effort to cross-check the information provided in Defendant's PFS. Plaintiff also obtained a copy of Defendant's recent tax returns and checked the Cuyahoga County real estate records. Plaintiff then crunched the numbers in its Credit Analysis in an effort to harmonize the outside information with the financial information produced by Defendant in his PFS. However, because the Cave Creek Home had very recently been acquired and the obligations to Everbank and Defendant's father had only just been incurred, neither the new debt totaling $1.5 million nor the monthly debt service of over $8,500/month could have reasonably been ascertained from available sources, independent of Defendant's PFS. Rather, the credit report, tax returns and County searches generally confirmed Defendant's positive net worth, or in the words of Street, Defendant's positive cash flow.

This Court finds that the additional investigation conducted by Plaintiff to determine Defendant's global cash flow was sufficient to determine that Defendant's Loan application should be approved. Plaintiff's reliance on Defendant's PFS and subsequent analysis of Defendant's credit report were reasonable for the purposes of §523(a)(2)(B).

Defendant's Response to Plaintiff's Post-Trial Brief cites to several cases in support of his argument that Plaintiff's reliance on the PFS was unreasonable. The Court finds the cases cited by Defendant to be distinguishable from the facts in this case. Defendant cites *Giovanni v. Grayson, Kubli & Hoffman*[49] for the proposition that "[a] plaintiff must investigate when he is warned or suspicious of a deception."[50] *Giovanni*

---

[48] Ex. 47, page 7.
[49] *Giovanni v. Grayson, Kubli & Hoffman*, 324 B.R. 586 (E.D. Va. 2005).
[50] DE 31 at page 7 of 14 lines 21 – 22.

16

involved a law firm agreeing to represent a client despite discovering that the client's claimed defenses were "bogus." Defendant also cites *Copper v. Lemke*[51] to argue that a lender's reliance was not justifiable when the lender continued to loan money after various "red flags" arose. *Copper* involved a lender repeatedly making loan advances well beyond the originally agreed upon total loan amount. Defendant also relies on *Dominion Va. Power v. Robinson*[52], a case involving a power utility company discovering that a customer's meter had been illegally tampered with and attempting to have the resulting electrical bill deemed non-dischargeable under § 523(a)(2)(A). Finally, Defendant relies on *In re Davis-Brown*[53], where the court found that a car dealership tailored the numbers of a debtor's financial statement to ensure approval of the loan. The court expressly noted that the creditor was complicit in debtor submitting a false financial statement. There was no allegation of Plaintiff working with Defendant in preparing and submitting the PFS in this case. All these cases are easily distinguished from the case at bar.

### G. Damage Resulted from Representations

Defendant defaulted on the Loan. Prior to Defendant's bankruptcy petition, Plaintiff obtained an Ohio State Court judgment against Defendant in the amount of $372,714.20 plus interest. That judgment was domesticated in Arizona.[54] This Court finds credible the evidence submitted by Plaintiff regarding the different course of action which it would have taken with Defendant's Loan application had Defendant truthfully disclosed his intent to move to Arizona, the newly incurred debt of $1.5 million and the attendant additional debt serving burdens. Had Defendant properly disclosed this information, Plaintiff would have halted the Loan application process and engaged in additional investigations and conversations with Defendant. This Court finds that, had Defendant's PFS not been materially false, Plaintiff would not have made the Loan to Defendant.

---

[51] *Copper v. Lemke*, 423 B.R. 917 (10th Cir. 2010).
[52] *Dominion Va. Power v. Robinson*, 340 B.R. 316 (Bankr. E.D. Va. 2006).
[53] *In re Davis-Brown*, 610 B.R. 641 (Bankr. E.D. Cal. 2019).
[54] See Ex. 11.

Having made the Loan based on Defendant's false written statement with respect to his then existing financial condition, Plaintiff was damaged because the Loan would not have been made but for such false statements. When Defendant subsequently defaulted on the Loan, the amount of Plaintiff's damage was memorialized in the Ohio judgment.

## VI. CONCLUSION

This Court finds Plaintiff has satisfied its burden of proving by a preponderance of the evidence that all seven of the 9th Circuit's §523(a)(2)(B) elements discussed in *Candland* have been satisfied. Defendant's debt to Plaintiff is non-dischargeable under §523(a)(2)(B). Defendant made numerous materially false written representations and omissions in his PFS submitted to Plaintiff in connection with the Loan. These omissions and representations of fact were material because they were central to Plaintiff's analysis of both Defendant's global cash flow and his overall liabilities. Defendant knew Defendant would rely on his PFS and that his PFS was materially false and/or that material facts were omitted from the PFS. Defendant made these misrepresentations with the intent to deceive Plaintiff. Plaintiff reasonably relied on Defendant's misrepresentations. As a result of these misrepresentations and omissions, Plaintiff approved the Loan to Defendant. But for these omissions and misrepresentations, this Court finds Plaintiff would not have made the Loan to Defendant. Defendant ultimately defaulted on the Loan resulting in a loss to Plaintiff of $372,714.20 plus interest, all as reflected in the pre-bankruptcy Ohio and Arizona judgments.

If Plaintiff seeks its costs and attorney's fees incurred in this adversary proceeding, its lawyers are directed to file no later than May 26, 2020, Plaintiff's application for allowance of such fees and costs. Defendant's response shall be filed no later than June 8, 2020. Any reply is to be filed by June 15, 2020. Once the Court rules on Plaintiff's costs and fees application, if any, Plaintiff is directed to then file a proposed form of judgment consistent with the findings and conclusions of this Court.

**DATED AND SIGNED ABOVE.**